FILED

# IN THE UNITED DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

Kori Cioca                          )
                                    )
████████████                        )
                                    )
                                    )          CASE NUMBER    1:11CV151
Mary Gallagher                      )          JURY DEMAND
                                    )                         LO/TCB
████████████                        )
                                    )
Rebekah Havrilla                    )
                                    )
████████████                        )
                                    )
Myla Haider                         )
                                    )
████████████                        )
                                    )
Sarah Albertson                     )
                                    )
████████████                        )
                                    )
Greg Jelovdou                       )
                                    )
████████████                        )
                                    )
Amber De Roche                      )
                                    )
████████████                        )
                                    )
Panayiota Bertzikis                 )
                                    )
████████████                        )
                                    )
Katelyn Boatman                     )
                                    )
████████████                        )
                                    )
Andrew Schmidt                      )
                                    )
████████████                        )
                                    )

Nicole Curdt                           )
█████████████                          )
                                       )
                                       )
Jessica Kenyon                         )
█████████████                          )
                                       )
                                       )
Andrea Neutzling                       )
████████████                           )
                                       )
                                       )
Kristen Reuss                          )
███████████                            )
                                       )    .
                                       )
Courtney Hurd                          )
█████████████                          )
                                       )
                                       )
Jessica Nicole Hinves                  )
████████████                           )
                                       )
                                       )
Stephanie Schroeder                    )
█████████████                          )
                                       )
                                       )
                                       )
          v.                           )
                                       )
Former Secretary of Defense            )
Donald Rumsfeld                        )
1718 M Street NW #366                  )
Washington, DC 20036                   )
                                       )
Secretary of Defense Robert Gates      )
Pentagon                               )
Arlington, VA 22202                    )
                                       )
                                       )
──────────────────────────────        )

## COMPLAINT

1.      This action seeks monetary damages under *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971) and *Davis v. Passman*, 442 US 228 (1979) to compensate Plaintiffs for being raped, assaulted and harassed while serving this nation as members of the military.

2.      Defendants violated Plaintiffs' Constitutional rights.  As detailed in the allegations below, Defendants failed to prevent Plaintiffs and others from being raped and sexually assaulted.  Defendants failed to (1) investigate rapes and sexual assaults, (2) prosecute perpetrators, (3) provide an adequate judicial system as required by the Uniform Military Justice Act, and (4) abide by Congressional deadlines to implement Congressionally-ordered institutional reforms to stop rapes and other sexual assaults.

3.      Instead, Defendants ran institutions in which perpetrators were promoted and where military personnel openly mocked and flouted the modest Congressionally-mandated institutional reforms.  Defendants ran institutions in which Plaintiffs and other victims were openly subjected to retaliation, were encouraged to refrain from reporting rapes and sexual assaults in a manner that would have permitted prosecution, and were ordered to keep quiet and refrain from telling anyone about the criminal acts of their work colleagues.  Defendants lack any legal justification for their failures to remedy such a flawed system.  Defendants' failures to act violated Plaintiffs' individual Constitutional rights.

### JURISDICTION AND VENUE

4.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

5.      Venue is proper pursuant to 28 U.S.C. § 1391 *et seq*.

## PARTIES

6.      Plaintiffs are veteran and active-duty servicemen and servicewoman who, while serving in the United States Army, Navy, Marine Corps, Coast Guard, or Reserves, have been raped, assaulted, and harassed by active duty members of the military.  They have been directly and seriously injured by Defendants' actions and omissions.

### PLAINTIFF KORI CIOCA

7.      Plaintiff Kori Cioca resides at ███████████████████████████████ She is a citizen of the United States.

8.      Seaman ("SN") Cioca served in the Coast Guard from August of 2005 to June 2007.  SN Cioca received the Sailor of the Quarter for Outstanding Work and Leadership.

9.      SN Cioca began to be harassed and threatened by her superior.  On one occasion, when SN Cioca made a mistake during a knot-tying quiz, her superior stated – in front of SN Cioca's work colleagues – that she was a "stupid fucking female, who didn't belong in the military."  Her superior spit in her face on that occasion.

10.     While changing out for training, SN Cioca's attacker would try to force the door open and tell her that "he needed to perform a Personal Protective Equipment Inspection."  Often, when this supervisor would walk past Ms. Cioca, he would grab her buttocks, and order her in a hateful tone to "turn you fucking disrespectful non-rate."

11.     SN Cioca complained about her superior's abusive behavior and expressed her fear of him to other military personnel in her military chain of command (hereinafter "Command").  Rather than resulting in a cessation of the superior's misconduct, this reporting led to an escalation.  The superior began to drive past her home multiple times during the day

4

and call her repeatedly, leaving voicemails threatening her life. He then began to break into her room at night, stand over her bed and masturbate. SN Cioca began sleeping with a knife under her pillow to defend herself.

12.    SN Cioca was aware that this supervisor would drink on duty when the Command had left for the day. At times, he would unlock her door with their keys when he was the Officer of the Day, which provided him access to the keys for the whole duty station.

13.    During one work day, SN Cioca's superior thrust his groin into her buttocks as she bent over to pick up some trash. He then called her a "fucking whore" and laughed. SN Cioca and another shipmate who had witnessed this incident went together to report the incident to Command. SM Cioca requested a transfer, but Command denied the request despite the harassment.

14.    Command informed the superior about the report, which led to him threatening to stab SN Cioca, the witness, and the families of both.

15.    This superior assigned SN Cioca to extra duty by herself that should have been assigned to a group of shipmates. SN Cioca was made to shovel boat ramps while the same superior screamed at her for going to her Command. He would blow his cigarette smoke in her face and told her that "[She] would pay for this, [he] was in charge and there wasn't anything a woman could do about it."

16.    SN Cioca often slept in her car because when she knew that the superior had been drinking. SN Cioca did not have the money to travel and her home was an hour and a half away.

17.    At the end of November 2005, the superior broke into SN Cioca's room. He was drunk and had an erection. He approached SN Cioca and directed her to touch his penis. When SN Cioca refused loudly (hoping another shipmate would hear), he grabbed her hand and pushed

it into his groin. When SN Cioca yelled again and pushed her superior away, he struck her so hard against the left side of her face that she was thrown across the room and against the wall.

18.     SN Cioca and two other shipmates who had witnessed the harassment of SN Cioca went to Command and reported the assault. Command did absolutely nothing.

19.     SN Cioca's Executive Petty Officer invited her to his church, and took her into a room at the Church of Jesus Christ of the Latter Day Saints. Once they were there, SN Cioca's chief and two other men put their hands on her head and prayed for her safety and for help from God. SN Cioca's chief said that he tried to talk to the Officer in Charge about the harassment of SN Cioca, but that the Officer said to "let her burn" because "she ruins careers."

20.     In December 2005, SN Cioca was ordered to go retrieve some keys from the superior, who was in his stateroom. Although she sought to persuade a shipmate to accompany her, no one would do so. Although SN Cioca stayed well outside the door, the superior realized that she was alone, and told her "get the fuck in here you disrespectful non-rate, or I will make you." He then grabbed SN Cioca by her hair, pulled her into his stateroom, shut the door, and raped SN Cioca.

21.     SN Cioca attempted to report the rape to Command, but was told to wait until after an Immigration and Customs Enforcement (ICE) symposium at the station was completed. SN Cioca's rapist attended the ICE symposium. During the ICE symposium, SN Cioca was ordered to stand watch and stay in radio communications with her rapist.

22.     Subsequently, Command obtained an admission of sex from the rapist, but told SN Cioca that if she pressed forward with reporting the sex as rape, she would be court-martialed for lying.  Command refused SN Cioca's pleas that she be permitted to take a lie detector test to establish the validity of her statement that she was raped.

6

23.  The rapist pled guilty only to hitting SN Cioca.  His only punishment was minor loss of pay and being restricted to base for 30 days.

24.  Command did not keep the rape and assault confidential, but instead permitted other military personnel to harass SN Cioca, call her names and spit on her.

25.  Command directed SN Cioca to sign a paper stating that she had had an inappropriate relationship with her rapist. When SN Cioca objected that the paper falsely portrayed rape as consensual sex, Command told SN Cioca that she was being ordered to sign, and could not refuse to do so.

26.  Command retaliated against SN Cioca. When military physicians treating SN Cioca for the severe injury to her jaw recommended surgery, Command transferred Ms. Cioca to a duty station lacking any surgeons.  Command also permitted Ms. Cioca to be sexually harassed at her new duty station in Saint Joseph Michigan, and then discharged her on the grounds that she had "a history of inappropriate relationships with individuals in the Coast Guard."

27.  As part of the discharge process, Command assigned SN Cioca to stay in an all-male barracks for sixty days.  In so doing, Command was intentionally ignoring the advice of military medical physicians who had diagnosed SN Cioca with post-traumatic stress disorder as a result of the rape and attacks, and advised that she should not be further traumatized by being forced to stay in an all-male barracks.

28.  SN Cioca suffers from post-traumatic stress disorder, major depressive disorder, and anxiety. She also suffers from bilateral disc displacement and an abnormal EEG due to nerve damage in her face.

## PLAINTIFF MARY GALLAGHER

29.     Plaintiff Mary Gallagher resides at ███████████████████████████
████████  She is a citizen of the United States.

30.     Technical Sergeant ("TSgt") Gallagher deployed to Iraq in 2009 as a member of
the Air National Guard.

31.     On November 5, 2009, while she was deployed in Iraq, a co-worker offered her a
ride home to her living quarters.  When she accepted, instead of driving her home, he drove her
to a remote area and tried to kiss her.  TSgt Gallagher threatened to report him.  He become
angry, and verbally assaulted TSgt Gallagher.  TSgt Gallagher reported the incident to her
Command, but they claimed that they could not do anything about it.

32.     On November 7, 2009, the co-worker began to stalk TSgt Gallagher.  He tried to
break into her room, claiming TSgt Gallagher "didn't know what she was missing."  He
telephoned her repeatedly.  TSgt Gallagher again reported her co-worker's threatening behavior
to Command, but was advised that they could not do anything because "it was a 'he said, she
said' situation".

33.     On November 12, 2009, the co-worker sexually assaulted TSgt Gallagher in the
restroom.  He pushed TSgt Gallagher up against the left side of the wall, took his right hand and
pulled TSgt Gallagher's pants and underwear down, and then used his hand to rub her vagina. He
simultaneously ground his penis against TSgt Gallagher, and talked about how much he was
enjoying the assault.

34.     TSgt Gallagher did not report the violent assault immediately because Command
had advised her that nothing could be done after she had reported the co-worker's threatening
behavior on November 5 and 7, 2009.

8

35.     Command contacted TSgt Gallagher approximately two weeks later, and asked for more details of the events that occurred on November 5 and 7, 2009.  At that point, TSgt Gallagher reported the violent assault.

36.     Command's only response was to reassign TSgt Gallagher's assailant and order him to refrain from any contact with TSgt Gallagher.  TSgt Gallagher was then lectured by the base chaplain, who claimed that 96% of sexual assaults on women occur when drinking is involved.  TSgt Gallagher had not been drinking during any of the assaults.

37.     Command later directed TSgt Gallagher to provide a statement for the Victory Base Compound Marshalls, which she did.  At that point, she was questioned about why she had "waited so long to report the assaults and harassment."  But in fact, TSgt Gallagher reported the first two assaults the very day after they occurred.

38.     TSgt Gallagher suffers from post-traumatic stress disorder.

## PLAINTIFF REBEKAH HAVRILLA

39.     Plaintiff Rebekah Havrilla resides at ███████████████████  ████████████ She is a citizen of the United States.

40.     Sergeant ("SGT") Havrilla served in the Army from January 2004 until September of 2009.

41.     During basic training, SGT Havrilla heard Command repeatedly equate being female with being weak or incompetent.  Command used the terms "bitch, pussy, fag, cunt" as a means of expressing disapproval.

42.     Command required SGT Havrilla and her work colleagues to attend classes regarding the prevention of sexual assault and harassment once per year.  Command, however, made a mockery of these classes.  As the instructor would describe prohibited conduct, one or

9

more of the class participants would immediately begin to engage in the prohibited conduct.  One solider stripped completely naked and got on the table during break in the middle of class. Command decided that his "punishment" for this conduct was to serve as the Equal Opportunity representative and serve as the next instructor for the sexual assault and harassment training.

43.     SGT Havrilla deployed to Afghanistan in 2006.  Her supervisor sexually harassed her, stating on one occasion that he "really wanted to fuck [her] right now."  On another occasion, as SGT Havrilla's peers watched, he walked up behind SGT Havrilla, grabbed her waist and kissed and bit the back of her neck.  He began to slap her bottom whenever he passed by.  He also belittled and mocked SGT Havrilla  SGT Havrilla suffered from the harassment to such a degree that she sought medical assistance.

44.     Subsequently, SGT Havrilla worked with an individual from a canine unit.  That same colleague raped her.  He pulled her into his bed, held her down, and raped her.  He also photographed the rape.

45.     SGT Havrilla reported the sexual harassment and rape within approximately one month, under the military's restricted reporting policy.

46.     In February of 2009 SGT Havrilla reported for four weeks of active duty training. During this training, she saw her rapist in the shopette on Fort Leonard Wood.  Upon seeing her rapist, SGT Havrilla went into shock.   She immediately sought the assistance of the military chaplain.  When SGT Havrilla met with the military chaplain, he told her that "it must have been God's will for her to be raped" and recommended that she attend church more frequently.

47.     SGT Havrilla suffers from post-traumatic stress disorder and chronic depression.

10

### PLAINTIFF MYLA HAIDER

48.     Plaintiff Myla Haider resides at ████ ███████████████████) ████ She is a citizen of the United States.

49.     Sergeant ("SGT") Haider served in the Army from 1994 to 1999 and again from November 2000 to October 2005.

50.     In 2002, SGT Haider was raped while she was interning with the Criminal Investigative Division (CID) in Yongsan, Korea.  The CID is the military unit charged with investigating crimes, including rape and sexual assault.

51.     On that occasion, SGT Haider socialized with a group of CID colleagues, including the rapist.  After the socializing ended, the rapist (a senior agent in CID) isolated SGT Haider from the group, and raped her.

52.     SGT Haider did not report the rape because she had worked on CID's investigations of sexual assaults.  She had witnessed firsthand the negative attitude that the CID had towards rape victims, and did not believe she would be able to obtain justice if she reported being raped.  However, she contemporaneously confided in one agent who was present and disclosed the rape to two additional friends, both other Division agents.  They promised her that they would not report the rape, and agreed with her assessment that reporting the rape would not lead to justice.

53.     Two years later, in November 2004, SGT Haider was contacted by a CID agent at Fort Riley, Kansas.  The Fort Riley agent had learned from one of SGT Haider's friends that she had been raped two years earlier by the senior CID agent.  The Fort Riley agent told SGT Haider that the CID agent who had raped her was being investigated as a serial sex offender because he had raped several women in addition to SGT Haider and indecently assaulted others.

11

54.     In April 2005, SGT Haider testified at her rapist's court marital.  However, the agents to whom she had contemporaneously reported the rape testified for the rapist.  SGT Haider later learned from one of the agents that they had been threatened by Command, and gave inaccurate testimony in order to preserve their careers in CID.

## PLAINTIFF SARAH ALBERTSON

55.     Plaintiff Sarah Albertson resides at ███████████████████████████ █████ She is a citizen of the United States.

56.     Corporal ("Cpl.") Albertson served in the Marine Corps from 2003 until 2008.

57.     On August 27th, 2006, Cpl. Albertson was raped by a fellow Marine, a man who held a higher rank in the Marines than Cpl. Albertson.

58.     When Cpl. Albertson advised her Command of the rape, Command advised Cpl. Albertson that, because she had been consuming alcohol, they would charge her with "Inappropriate Barracks Conduct."   Command also told Cpl. Albertson that were going to charge the perpetrator with the very same offense ("Inappropriate Barracks Conduct") for raping her.

59.     Command told Cpl. Albertson that she was not allowed to discuss the rape with anyone else, but was required by law to report it to them.

60.     Command also ordered Cpl. Albertson to "respect" her assailant and follow his orders because he outranked her.

61.     After Cpl. Albertson reported the assault to Command, her superiors, acting openly with the knowledge, support and approval of Command, ostracized and harassed Cpl. Albertson.

12

62.     Command ignored the professional advice provided by the military counselor assigned to the matter, and forced Cpl. Albertson to interact with her rapist repeatedly for two full years.  When Cpl. Albertson suffered from a panic attack brought on by being forced to be in the same office as the rapist, Command reprimanded Cpl. Albertson.

63.     Command ignored the professional advice provided by the military counselor assigned to the matter, and refused Cpl. Albertson's requests for leave to handle the trauma of being raped by a fellow Marine.

64.     Command refused Cpl. Albertson's request to change housing, and instead forced Cpl. Albertson to live one floor below her rapist for two years.

65.     Command required Cpl. Albertson to disclose the medications she had been prescribed to counter the trauma of being forced to live and work with her rapist.  After Command reviewed the list, they suspended Cpl. Albertson's security clearance and downgraded her work assignments.

66.     Command placed Cpl. Albertson in a Body Composition Program, and then promoted the rapist to head up that program.  Command forced Cpl. Albertson to report to her rapist on a daily basis.

67.     Although the Navy Criminal Investigative Service ("NCIS") investigated the matter, Cpl. Albertson's Command failed to permit the matter to be adjudicated within the military system of justice.  As a result, Cpl. Albertson's rapist was never prosecuted or otherwise brought to justice in any way.

68.     Cpl. Albertson has been diagnosed with post-traumatic stress disorder.

### PLAINTIFF GREG JELOUDOV

69.     Plaintiff Greg Jeloudov resides at ████████████████ He is a citizen of the United States.

70.     Private ("PVT") Jeloudov served in the Army from February 2009 until June 2009.

71.     During basic training, PVT Jeloudov was verbally harassed by his fellow soldiers. One two different occasions, PVT Jeloudov's colleagues said "We'll send you back to Russia split in half, you commie faggot", and "Now you champagne socialist faggot from New York gonna get what you deserve."

72.     On May 17, 2009, PVT Jeloudov was raped in his barracks.

73.     PVT Jeloudov reported the rape to Command. His Command laughed at him. His drill sergeant turned to another sergeant present, stating "Can you believe this shit?"

74.     Rather than properly investigate the matter, Command instead forced PVT Jeloudov to sign a typed statement on May 19, 2009, stating – falsely -- that he was a "practicing homosexual." Command then used the statement to discharge PVT Jeloudov under the "Don't Ask, Don't Tell" policy.

75.     PVT Jeloudov suffers from post-traumatic stress disorder.

### PLAINTIFF AMBER DE ROCHE

76.     Plaintiff Amber De Roche resides at ████████████████ ████████████ She is a citizen of the United States.

77.     Petty Officer De Roche served in the Navy from December 2000 to December 2005.

78.     In August of 2001, Petty Officer De Roche was raped by two shipmates in a hotel room while on port of call in Thailand. One assailant ripped off Petty Officer De Roche's clothes and held her down while the other assailant raped her. Then, the first rapist held Petty Officer De Roche down while the second assailant raped her. This sequence was repeated several times. Thereafter, one of the rapists placed Petty Officer De Roche in the shower, and washed her. They then removed her from the hotel room, and put her out on the streets of Thailand.

79.     Petty Officer De Roche found her way back to her hotel. The next day, Petty Officer De Roche told a female friend about being repeatedly raped. The friend took Petty Officer De Roche to the military police on duty. The military police brought Petty Officer De Roche to a sexual assault coordinator, who took her for a medical exam. Petty Officer De Roche was bruised and injured to such a degree during the assault that the physician stopped the exam and began to cry because he was so distraught about the extent of her injuries.

80.     After Petty Officer De Roche reported the rapes, she became a target of harassment. She was imprisoned on the medical ward, and denied food. While this was occurring, her Command refused to let her leave the ship and forced her to be on call for 24 hours per day without receiving any counseling to assist her in recovering from the rapes.

81.     Petty Officer De Roche sought out the ship's chaplain, and told him she was suicidal as a result of the rapes and her subsequent mistreatment. As a result, Petty Officer De Roche was finally permitted to leave that ship, and serve out the remainder of her duty on another ship.

82.     Command did not court martial the perpetrators, but instead handled the matter with so-called "non-judicial punishment." Command docked the two rapists' pay for six

15

months, and reduced the rank of one of the rapists. Both were permitted to remain on active duty.

83.     Command advised Petty Officer De Roche of this outcome, told her she should "accept the situation," and refrain from speaking out against the lack of punishment or accountability.

84.     Petty Officer De Roche suffers from post-traumatic stress disorder.

### PLAINTIFF PANAYIOTA BERTZIKIS

85.     Plaintiff Panayiota Bertzikis resides at ███████████████████ ███████████████ She is a citizen of the United States and served in the Coast Guard from November 2005 until May 2007.

86.     On May 30, 2006, Seaman ("SN") Bertzikis was raped by a shipmate when she was stationed in Burlington, Vermont. During a hike, her rapist threw SN Bertzikis on the ground, punched her in the face, and raped her.

87.     SN Bertzikis reported the rape to her Command who told SN Bertzikis to cease speaking of the rape or be charged with a military crime equivalent to slander. SN Bertzikis later obtained photographs and admissions made by her rapist through the Freedom of Information Act.

88.     However, Command failed to take any substantial steps to investigate the matter or have it adjudicated within the military system of justice. As a result, SN Bertzikis' rapist was never prosecuted or otherwise brought to justice in any way.

89.     Instead, Command forced SN Bertzikis to live on the same floor as her rapist in barracks where he would remain a constant threat, day and night. Command also forced SN

Bertzikis to work with her rapist, and was told that they should use the time to "work out their differences."

90.     Command was well aware of, but did not stop, further assaults and harassment of SN Bertzikis. When SN Bertzikis was transferred to Boston, Massachusetts, Command permitted Coast Guard personnel to call SN Bertzikis a "liar" and a "whore." While she was on base performing her work duties, a group of Coast Guard personnel cornered SN Bertzikis and tried to rip off her uniform. They called SN Bertzikis a "crazy lying whore" and said she would "pay for snitching" on their friend. They threatened to rape her again.

91.     When SN Bertzikis reported this assault to the "victim advocate" assigned by the Coast Guard, she was advised that she should not report this assault and other harassment because she would be seen as "difficult" and would not receive any assistance in bringing her rapist to justice. In addition, SN Bertzikis' appointed attorney told her that "If [her rapist] did not have a history of sexual assault, why would he assault anyone now?"

92.     SN Bertzikis was denied rank despite the fact that she had met all the necessary requirements because of the "pending investigation."

93.     As a result of her experience, SN Bertzikis founded the Military Rape Crisis Center. In that role, she has spoken with thousands of women who were raped, but who, like her, were told not to report the rape because doing so would get them (but not the rapists) in trouble.

94.     SN Bertzikis was diagnosed with post-traumatic stress disorder.

## PLAINTIFF KATELYN BOATMAN

95.     Plaintiff Katelyn Boatman joined the Navy after graduating from high school in 2007. She is a citizen of the United States and presently is on active duty.

17

96.     Ms. Boatman graduated from the Survival, Evasion, Resistance, and Escape ("SERE") school, and was assigned to Tinker Air Force Base in Oklahoma.

97.     During Ms. Boatman's tenure as an aviator at Tinker, she was subjected to severe harassment by her Command. On one occasion, her commander asked her in front of other naval aviators if she "liked it in the ass." When Ms. Boatman refused to respond, he called her a "prude cunt."

98.     Ms. Boatman responded to the constant and pervasive sexual harassment by remaining in her living quarters when not on duty, and by avoiding social occasions attended by work colleagues. However, Command viewed Ms. Boatman's efforts to avoid the debilitating harassment as "an attitude problem" and ordered her to socialize or risk demotion or career stagnation.

99.     On December 2, 2010, as a result of Command's directive, Ms. Boatman attended a holiday party and socialized with her fellow naval aviators. After the holiday party ended, Ms. Boatman joined her work colleagues in socializing at a nearby bar. There, two of her work colleagues drugged Ms. Boatman, and brought her to their apartment. Although Ms. Boatman lacks any memory as a result of being drugged, physical evidence establishes that one or more persons raped her.

100.    Ms. Boatman reported the rape to Command. Although the military's criminal investigative service began an investigation, Command intervened and closed the matter, citing a lack of evidence. Ms. Boatman's rapist or rapists have not been prosecuted or otherwise brought to justice within the military system of justice in any way.

101.    Ms. Boatman is being forced by these circumstances to relinquish her planned career in the U.S. military serving this nation.

## PLAINTIFF ANDREW SCHMIDT

102.    Plaintiff Andrew Schmidt resides at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ He is a citizen of the United States.

103.    Mr. Schmidt served in the Navy from 1999 until 2001 as a Corpsman.

104.    In spring 2001, Corpsman Schmidt was assigned to the 2nd Battalion, 8th Marines, at Camp Lejeune.   His lieutenant ordered the unit to line up to receive some gear, including fins, masks and a dive knife.   As he was lining up, a Marine corporal shoved his fingers up Corpsman Schmidt's anus until they penetrated him.   Corpsman Schmidt protested to his attacker, who apologized.   Corpsman Schmidt did not report this incident, as he thought it was highly unusual, and would not happen again.

105.    However, this same individual assaulted Corpsman Schmidt in a similar manner later in the year. This time, Corpsman Schmidt protested loudly and a Sergeant came over to them. The Sergeant made the assailant apologize, but no further action was taken.

106.    Soon after, his Command ordered Corpsman Schmidt to remove a mole on his assailant's leg.   This forced touching of his assailant caused Corpsman Schmidt distress, and he complained to his Command.

107.    Corpsman Schmidt transferred to the USS Shreveport.   There, several different Marines assaulted him by holding him against the wall while his testicles were fondled, squeezed, or tickled.   On one occasion when he was being assaulted, Corpsman Schmidt turned around and punched his assailant.   A Corporal who had seen both the assault and the punch intervened, berated Corpsman for striking a superior.   However, the Corporal backed down when Corpsman Schmidt complained that he was defending himself from sexual assault.

19

108.    Corpsman Schmidt's attackers held a higher rank than he did, which made it difficult for him to achieve justice. When he reported the frequent incidents of sexual abuse to his Command, they encouraged him to avoid 'reporting against one of your own." Later, Command bluntly advised Corpsman Schmidt that reporting the sexual abuse would ruin his career because "bad things happen to those who rock the boat."

109.    When Corpsman Schmidt pressed forward with reporting the abuse, his Command physically threatened him, and told him "Don't make us deal with you in a physical way," and that "the Marine Corps know where your mother is" because she was listed as his emergency contact. Thereafter, Corpsman Schmidt was cornered several times and told that he was going to be beaten.

110.    In April 2002, Corpsman Schmidt contacted the office of Senator Dodd in search of help. His office sent the matter to Marine Headquarters, but Headquarters merely told the battalion to investigate themselves and send back a report. The battalion report claimed that Corpsman Schmidt was a liar, and that all his accusations were unfounded.

111.    In September of 2002, Corpsman Schmidt was reassigned, but his former Command told his new location that he was a "snitch." This led to continued physical and verbal abuse.

112.    Corpsman Schmidt persisted in trying to report the abuse, contacting the Naval Criminal Investigative Service (NCIS) on two occasions while stationed in Camp Lejeune, North Carolina. No one from NCIS would meet with him.

113.    After two years of trying, Corpsman Schmidt was finally allowed to meet with the Commanding General of Fort Lejeune. This General admitted that physical abuses described by

20

Corpsman Schmidt were occurring, but claimed that such conduct did not rise to the level of sexual harassment or assault.

114.    In April 2003, Corpsman Schmidt left the military.   After leaving the military, Corpsman Schmidt learned that many of his assailants had been promoted.

115.    Corpsman Schmidt has continued to contact military and civilian officials at NCIS, the FBI, and Defense Criminal Investigative Service (DCIS).  Nothing has been done.

116.    Corpsman Schmidt suffers from extreme emotional distress.

## PLAINTIFF NICOLE CURDT

117.    Plaintiff Nicole Curdt resides at ███████████████████████ She is a citizen of the United States.

118.    Damage Control Firearm Apprentice ("DCFA") Curdt served in the Navy from 2000 until 2003.

119.    DCFA Curdt was assigned to serve on a ship. When DCFA Curdt was working on watch, member of her Command cornered her in a passageway in an engine room in noisy and isolated area. He told her that he had heard what a "good piece of ass" DCFA Curdt was, and that she would not be permitted to go free until she had engaged in oral sex. He told her that screaming would not help, as the machinery was too loud for anyone to hear (which DCFA Curdt knew to be true.).   He then sexually assaulted DCFA Curdt.

120.    On July 21, 2002, DCFA Curdt sought out the naval Chaplain who had just been brought aboard the ship. DCFA Curdt asked the Chaplain if she could seek his help on a confidential basis, and was assured that she could. DCFA Curdt told the Chaplain about the sexual assault in the ship engine room.  The Chaplain asked for but did not directly obtain DCFA Curdt's permission to make an anonymous report to Command.

121. The very next day, the man who had assaulted DCFA Curdt in the ship engine room told DCFA Curdt that "everyone on the ship was looking for" DCFA Curdt because Command had ordered the Chaplain to produce the source of the complaints.

122. Command interviewed DCFA Curdt, and directed her to cooperate with the military's criminal investigative service. She did so, but objected when the investigating agent asked her to sign a summary of her remarks that was riddled with inaccuracies and omissions. The agent told DCFA Curdt that she would be court-martialed if she did not sign the statement as drafted. As a result, DCFA Curdt signed the statement.

123. In August of 2002, Command told DCFA Curdt that she was not permitted to speak to the media or to anyone else about the events on the ship. Command gave DCFA Curdt a document described as a "direct gag order."

124. Command retaliated against DCFA Curdt for reporting the sexual assault and the sexual harassment by demoting her from an E-3 to an E-2, fining her approximately half month's pay times two and restricted her to quarters for sixty days.

125. Command discharged DCFA Curdt in June 2003 with an "Other Than Honorable" discharge for "Serious Misconduct." It took DCFA Curdt six years of effort to eliminate that unjust ranking from her service record. In contrast, Command permitted the perpetrator to remain on active duty after serving a very short term of imprisonment.

126. DCFA Curdt suffers from post-traumatic stress disorder.

### PLAINTIFF JESSICA KENYON

127. Plaintiff Jessica Kenyon resides at ██████████████████████ ███████ She is a citizen of the United States.

128. Private ("PVT") Kenyon joined the Army in from August 2005 to August 2006.

22

129.   During advanced and individual training at Fort Eustis, PVT Kenyon's teaching sergeant began to harass her. He constantly touched her, and made sexual jokes and comments to her. PVT Kenyon did not believe it would be effective to report the teaching sergeant because the commander of the unit was openly misogynistic, stating "this unit never had any problems until females came into it."

130.   In December 2005, while PVT Kenyon was home for the holidays, she was raped by a member of the Army National Guard. At that point, PVT Kenyon reported both the sexual harassment by the drill instructor and the rape to an Army sexual assault response coordinator. This Army official advised PVT Kenyon to put the rape "on the back burner" and focus on the sexual harassment. PVT Kenyon then discussed the rape with command, who advised that the rape would be used against PVT Kenyon during promotional reviews if she sought to prosecute the rapist.

131.   After PVT Kenyon reported the harassment and rape, she was ostracized and retaliated against by her fellow soldiers. This retaliation followed PVT Kenyon to her next assignment, Camp Humphreys, Korea. When she arrived, the sergeant advised her that he had received calls warning him about her. The sergeant then made a unit-wide announcement cautioning everyone that they now "should be careful who you talk to because they might report you." The sergeant and others soldiers engaged in going sexual harassment of PVT Kenyon.

132.   In spring of 2006, one soldier, a specialist and squad leader, sexually assaulted PVT Kenyon. He put his hand under her shirt on her breasts, and tried to make PVT Kenyon touch his penis. PVT Kenyon fought him off.

133.   PVT Kenyon reported the assault to her Command.   When required to make a statement under oath to CID, the assailant denied the sexual assault had occurred. CID

administered a lie detector test, which the assailant failed. The assailant then recanted his sworn testimony and admitted that he had tried to force PVT Kenyon to have sex with him.

134.    Command charged the assailant with "lying on a sworn statement" and imposed only a non-judicial punishment. The assailant was demoted two ranks, and given forty-five days of extra duty. He remained on active duty.

135.    PVT Kenyon suffers from post-traumatic stress disorder.

## PLAINTIFF ANDREA NEUTZLING

136.    Plaintiff Andrea Neutzling resides at ███████████████████████ She is a citizen of the United States.

137.    Specialist Neutzling served in the Army from 2000 until 2004, and then served in the Army reserves from August 2004 until April 2010.

138.    In 2002, while serving in Korea, Specialist Neutzling was sexually assaulted by an intoxicated work colleague outside the latrine. Although Specialist Neutlzing reported the assault to Command, her assailant was sentenced to only five days of base restriction.

139.    In June 2005, Specialist Neutzling deployed to Iraq and was assigned to a new Military Police unit for training. One of her fellow soldiers sexually assaulted Specialist Neutzling, but she did not report it as a result of her prior experience in reporting sexual assault to Command.

140.    In August of 2005, Specialist Neutzling deployed again to Iraq. After being in country for two weeks, Specialist Neutzling was raped by two soldiers from the unit that was scheduled to depart Iraq as their unit was being replaced by Specialist Neutzling's unit. The soldiers were drunk when they raped her, and they threatened to beat her if she struggled. Specialist Neutzling suffered seriously bodily injury from the rapes, including bruises from her

24

shoulders to her elbows from being held down.  Specialist Neutzling did not report the rapes as a result of her past experience in reporting sexual assault.

141.    However, when Specialist Neutzling learned that the rapists were circulating a video of the rape, Specialist Neutzling reported the rapes to Command.  Command told Specialist Neutzling that they did not believe she had been raped because she "did not act like a rape victim" and "did not struggle enough."

142.    Command told Specialist Neutzling that Command from both units agreed to refrain from disclosing Specialist Neutzling's allegations of rape to the investigative services because they wanted to make sure the departing unit was permitted to go home on time. Additionally, Specialist Neutzling's Command downgraded the complaint for sexual assault to sexual harassment. Command advised Specialist Neutzling that her rapists would have had to stay in Kuwait until the investigation was complete if Command disclosed the rape outside the unit, and Command did not want to make them do so.

143.    Specialist Neutzling suffers from post traumatic stress disorder.

## PLAINTIFF KRISTEN REUSS

144.    Plaintiff Kristen Reuss resides at████████████████████ She is a citizen of the United States.

145.    Ms. Reuss served in the Ohio Army National Guard, 135th Military Police Company, from July of 1998 until July of 2004.

146.    In July 2001, Ms. Reuss' commander sexually assaulted her on three occasions. The final assault occurred during an annual training session convened in Alpena, Michigan.  On July 21, 2001, Ms. Reuss confided in a female lieutenant about the sexual assaults, but was

25

reluctant to disclose the identity of her attacker. The female lieutenant implied to Ms. Reuss that she already knew who it was, and implied that he had assaulted others in the past.

147.    Within hours of reporting the assault, Command arrive in Alpena, and began questioning Ms. Reuss and her colleagues. During the questioning, another female came forward admitting that the commander also sexually assaulted her. The local police jailed the commander after he failed a lie detector test.

148.    Ms. Reuss' unit returned to Ohio, but Ms. Reuss was told that two charges of criminal sexual assault were filed. Shortly thereafter, she learned that the charges had been dropped. Instead, Command forced the commander to resign from the Guard.

149.    Two years later, in 2003, Ms. Reuss deployed to Baghdad. She discovered that her assailant is now a Major in the Army Reserves. She also learned that he had previously been charged with domestic violence and theft.

150.    Ms. Reuss suffers from depression.

### PLAINTIFF JESSICA NICOLE HINVES

151.    Plaintiff Jessica Nicole Hinves resides at█████████████████████████ ████ She is a citizen of the United States.

152.    A1C Hinves (then Day) joined the Air Force in November, 2007. She is scheduled to medically retire on April 23, 2011.

153.    In January 2009, an Air Force co-worker raped her when she was serving temporary duty at Nellis Air Force base. He broke into her room through the bathroom at approximately 3am in the morning.

154.    A1C Hinves reported the rape, and went to the hospital for medical care.

155.    Friends of the rapist learned of the report, and began to harass A1C Hinves.

156.   A1C Hinves pursued the matter through the military's judicial system, and understood that the rapist was scheduled to stand trial in his court martial on a date certain.

157.   However, a few days before the court martial date, A1C Hinves' rapists' new commander dismissed the prosecution, as he is permitted to do under the military system of deference to the commanders. A1C Hinves' rapists' commander had no legal training, and had only been in his job for four days. Nonetheless, he ordered that the court martial process be abandoned.

158.   A1C Hinves' rapist was given an award for "Airman of the Quarter" and A1C Hinves was transferred to another base.

159.   A1C Hinves suffers from panic attacks and anxiety.

### PLAINTIFF STEPHANIE B. SCHROEDER

160.   Plaintiff Stephanie B. Schroeder resides at ████████████████ ████████ She is a citizen of the United States.

161.   Private Schroeder served in the Marine Corps between 2001 and 2003.

162.   On April 20, 2002, Private Schroeder was raped by a fellow Marine. She was socializing with some work colleagues, and left them to go to the restroom. The rapist followed Private Schroeder into the women's restroom, shoved her down, and started punching and hitting her until he forced her onto her back. He then ripped Private Schroeder's pants down and raped her, ejaculating on her inner left thigh. After he had raped her, he verbally berated her and spit on her.

163.   When Private Schroeder got back to her base, she reported the rape to Command. Command laughed at her and said, "Don't come bitching to me because you had sex and changed your mind."

164.   Command's only "investigation" was to ask Private Schroeder's rapist if he had raped her. When he denied raping her, Command accused Private Schroeder of lying and placed her on restriction. Command told Private Schroeder that, "Shitbags like you aren't allowed to have liberty." Command instructed Private Schroeder to remain in her room, and did not permit her to seek medical help or any type of counseling.

165.   Private Schroeder shared the fact of the rape, and Command's treatment of her, with a fellow Marine. Command learned of this discussion, and accused Private Schroeder of lying and issued her a non-judicial punishment under Article 92 for "Conduct Unbecoming." Because of this punishment she could not be promoted, and had to forfeit her pay and allowance. She was also put on restriction for two weeks.

166.   Command failed to investigate or punish Private Schroeder's rapist in any way. Instead, Command forced Private Schroeder to continue to work with her rapist.

167.   When Private Schroeder was transferred to a new duty location, Command called and told her new supervisors that she was a "troublemaker."

168.   Two weeks after the transfer, Private Schroeder's superior attempted to sleep with Private Schroeder. When she refused, he began to humiliate her at work. For example, when Private Schroeder contracted pink eye, he asked her in front of the entire formation if she had "Let a guy jizz in her eye." He then permitted the formation to laugh at and mock Private Schroeder.

169.   Private Schroeder reported the sexual harassment, but Command failed to investigate or punish her superiors. A month after Private Schroeder reported the sexual harassment to Command, the superior entered Private Schroeder's room without her consent while she was sleeping. He assaulted her.

28

170.    The following morning, Command disciplined Private Schroeder for having a male in her room.  She was ordered to perform menial labor throughout the night, and then work her normal duties during the day.

171.    Private Schroeder moved off base because she feared for her safety.  Yet a week later, Command again sought to discipline her falsely for having males in her room. When she demonstrated the impossibility of the accusation, Command reprimanded her for moving off base without permission.

172.    In November of 2002, Private Schroeder was ordered to help a male Marine move some equipment to a new warehouse. She and the male Marine drove together alone in his truck. On the way there, he made a detour into the woods and attempted to have sex with Private Schroeder.  When she refused, he began to masturbate in front of her. When she tried to exit the vehicle, he locked the doors. While he masturbated he said obscene things like, "Show me your tits", "Help me masturbate" and "You masturbate for me."

173.    Private Schroeder did not report this assault because she believed it would be more detrimental to her career.

174.    Private Schroder suffers from depression and anxiety.

**DEFENDANTS**

175.    Defendants Donald Rumsfeld is the former Secretary of the United States Department of Defense.  His business address is 1718 M Street NW #366, Washington DC 20036.

176.    Defendants Rumsfeld served as Secretary from 1975 to 1977, and again from 2001 until December 18, 2006.  Defendant Rumsfeld's acts and omissions that led to this lawsuit occurred in this district.

177.    Defendant Robert M. Gates is the Secretary of the United States Department of

Defense.  His business address is Pentagon, Arlington VA.  Defendant Gates began serving as

the Secretary on December 18, 2006, and continues to serve to date.  Defendant Gates' acts and

omissions that led to this lawsuit occurred in this district.

## SYSTEMIC FAILURE TO STOP RAPE AND SEXUAL ASSAULT

178.    Rape and sexual assault is widespread in the military.  The chart portrays the

rising number of rapes and other sexual assaults:

| | |
|---|---|
| 2006 | 2,947 |
| 2007* | 2,688 |
| 2008 | 2,908 |
| 2009 | 3,230 |

*Change from calendar year to fiscal year reporting methods

179.    Rapes and sexual assaults are widespread at the academies, which are the training

grounds for the military leaders.   According to the 2009 *Annual Report on Sexual Assaults in the

Military*, there were 41 reports of sexual assault in the academies in fiscal year 2009.  The

Department of Defense estimated that this reported number represents less than ten percent of the

actual unwanted sexual contacts. 2009 *Annual Report on Sexual Assaults in the Military.*

180.   The Department of Defense has admitted that rape and sexual assault harms the military's readiness. As stated in the 2009 *Annual Report on Sexual Assaults in the Military*: "In the armed forces sexual assaults not only degrades individual resilience but also erodes unit integrity. Service members risk their lives for each other to keep fellow service members out of harm's way. Sexual assault breaks this important bond and tears apart military units. An effective fighting force cannot tolerate sexual assault within its ranks. Sexual assault is incompatible with military culture, and *the costs and consequences for mission accomplishments are unbearable*." (Emphasis added.)

181.   Yet as evidenced by the Plaintiffs' experiences described above, the actual rapes and sexual assaults are only the beginning. Plaintiffs suffered greatly by reporting the rapes and assaults.

182.   After Plaintiffs and other victims reported the crimes against them, they were retaliated against, drummed out of the services, or, in some tragic cases, killed. For example, in 2007, Marine Lance Corporal Lauterbach was raped by a fellow Marine. When she reported the rape, "she was met with skepticism, if not outright disbelief, by her superiors and met with harassment and ostracism by her male fellow Marines. . . .That six-month nightmare ended when she was murdered and buried in a shallow fire pit in the backyard of fellow Marine Cpl. Cesar Laurean." *See Written Statement of Merle F. Wilberding, February 24, 2010, House Committee on Oversight and Government Reform.* Mr. Wilberding's Statement describes the experiences of other victims.

183.   After Plaintiffs and other victims reported the crimes, they were branded "troublemakers" and deprived of any opportunities for career advancement. Many lost their

security clearances as a result of seeking assistance from the military medical system to handle the emotional aftereffects of being raped and assaulted.

184.   Even more importantly, Plaintiffs and other victims confronted an environment in which the perpetrators were not prosecuted.  In 2007, only eight percent of those accused of rape or sexual assault were court martialed.  The remainder confronted only "non-judicial punishment" or no consequences whatsoever.  Commanders are permitted to make judicial decisions.

185.   As a result of this hostile environment, the Department of Defense estimates that only 20 percent of servicemembers who experience "unwanted sexual contact" report the matter to a military authority.  *See 2009 Annual Report on Sexual Assaults in the Military.*  Thus, the true numbers of rape and sexual assaults are likely to be as follows:

| | |
|------|--------|
| 2006 | 14,735 |
| 2007 | 13,440 |
| 2008 | 14,540 |
| 2009 | 16,150 |

186.   After Plaintiffs and other victims reported the crimes, Command forced them to salute and otherwise show "respect" for their rapists.  Plaintiffs were forced to live and work

alongside their rapists, and some were put under their direct command. Plaintiffs lacked any legal right to simply quit the military or walk away from their rapists in a workplace setting.

187. The Department of Defense fails to report conviction rates from courts martial, which is critical data needed by Congress to assess whether reforms are being implemented. *See* February 24, 2010, Statement for the Record by the Honorable Louise M. Slaughter (D-N.Y.), submitted to the Committee on Oversight and Government Reform, Subcommittee on National Security and Foreign Affairs, for Hearing -- Sexual Assault in the Military Part IV: Are We Making Progress?

188. The Department of Defense destroys evidence gathered during forensic examination after only one year from its collection date if the victim has chosen to use the restricted reporting system. 2009 *Annual Report on Sexual Assaults in the Military at 5.*

189. The Department of Defense established that "restricted reporting system" in an effort to provide health care on a confidential basis to those rape and assault victims not willing to report the crimes against them, but the restricted reporting does not remain confidential. Instead, the Command learns that a report has been made, and is often able to ascertain by the description of the circumstances who made the report. 2009 *Annual Report on Sexual Assaults in the Military at 11.* As a result, even those who chose the restricted route because they were fearful of retaliation are subjected to retaliation. Additionally, restricted reporting limits disclosure to anyone, and denies rape and assault victims a support system.

190. Rapes and sexual assaults continue to occur at increasing rates because the top leadership - namely, the Defendants – failed to challenge the misogynistic military culture that prevented the various programs from being fully implemented. Instead, Defendants delegated

the entire problem to a single small office called the Sexual Assault and Prevention and Response Office.

191.    Defendants selected Dr. Kaye Whitley to head up the office. Dr. Whitley described herself in Congressional testimony as follows: "For 26 years, I was an Army wife. . . I worked with other spouses to build support systems, organize community events, and develop scholarship funds for military family members. I went on to get my Doctorate in Counseling and Human Development. . . I have since served in a variety of positions inside and outside the Department. . . Today I stand before you. . . as a woman who is passionate about the cause of caring for the victims of this crime." But although the office director, Dr. Kaye Whitley, may be making genuine efforts to assist Plaintiffs and other crime victims grappling with after-effects of being raped, she is ill-equipped to lead an effort to eradicate a well-entrenched misogynistic military culture that permits Command to scoff at rape allegations, threaten victims with courts martial, and exercise unfettered discretion to decide to use "nonjudicial punishment" to penalize rape and sexual assault.   She lacks any military rank.  She lacks any law enforcement or investigatory background or authority.   Neither she nor her small staff have the necessary power to force any substantial changes in the military culture.

192.    The Defendants alone enjoyed the power to ensure that Plaintiffs' Constitutional rights were respected and to eliminate quickly the glaring dysfunctions in the military system of responding to reports of rape and sexual assault. As stated in the  General Accounting Office's report on  February 24, 2010,  the Department of Defense and the Coast Guard's "successful program implementation will require the personal involvement of top DOD and Coast Guard leadership in order to maintain the long-term focus on and accountability for program objectives. Without such support, DOD's and the Coast Guard's programs will not be able to maximize the

benefits of their respective prevent and respond initiatives, and they may not be able to effect the change in military culture to ensure that their programs are institutionalized." *See* GAO Report entitled "DOJ's and the Coast Guard's "Sexual Assault Prevention and Response Programs Need To Be Further Strengthened."

193.    Only Defendants had and have the power and position to change the military culture that permits widespread rape and sexual assaults.  Neither Defendant used their power and position to do so.  By repeatedly failing to do so, they violated Plaintiffs' Constitutional rights.

194.    Defendants know that servicemembers were being forced to work daily side-by-side with their rapists. Defendants know that servicemembers cannot move to another apartment or another city, but can be and are forced to live in the same quarters as their rapists. Defendants know that servicemembers cannot take any personal action that civilians might take to protect themselves from an ongoing threat – call the police, go to a shelter, change housing or jobs, or even get out of town.   Defendants know that servicemembers were being ordered to keep quiet. Thus, Defendants were well aware that their personal failures to tackle the systemic issues were leading directly to Constitutional deprivations of life, liberty, due process, equal protection and the right to free speech.

## DEFENDANT RUMSFELD VIOLATED PLAINTIFFS' CONSTITUTIONAL RIGHTS

195.    Defendant Rumsfeld violated Plaintiffs' constitutional rights by failing to take reasonable steps to prevent Plaintiffs from being repeatedly raped, sexually assaulted and sexually harassed by federal military personnel, and by impeding Plaintiffs' exercise of their First Amendment rights.

196.    In 2002, Defendant Rumsfeld was advised by the Veterans Administration that twenty percent of female veterans had been subjected to sexual assaults inflicted by their fellow soldiers.

197.    In 2004, Congress passed Public Law 105-85, which required the Secretary of Defense to establish a commission to investigation policies and procedures with respect to the military investigation of reports of sexual misconduct.   Defendant Rumsfeld ignored this Congressional directive and failed to appoint any members of the commission.   Defendant Rumsfeld resigned without having appointed any members of the task force, and without directing the task force to begin its work.

198.    On March 31, 2004, Members of Congress wrote to Defendant Rumsfeld expressing concern that then-Secretary of Defense Rumsfeld had ignored the recommendations made in 18 reports issued over the previous 16 years. The Members stated, "[w]e are concerned that the problem of sexual misconduct in the military is repeatedly investigated, but recommendations for substantive change in the reports are often ignored."   Reasonable discovery will show that Defendant Rumsfeld expressed scorn and derision towards Congressional efforts to eradicate sexual assault in the military. Defendant Rumsfeld's inaction sent a message that the military was resisting efforts Congressional oversight efforts designed to change a military culture where rape, sexual assault and sexual harassment were not prosecuted or otherwise deterred.

199.    Defendant Rumsfeld repeatedly permitted military Command to rely on the Article 15 (nonjudicial punishment) process for allegations involving rapes, sexual assaults, and sexual harassment.

36

200.   Defendant Rumsfeld repeatedly permitted military Command to interfere with the impartiality of criminal investigations.

201.   Defendant Rumsfeld repeatedly permitted the military Command to charge those alleged to have raped or sexually assaulted a co-worked under UCMJ Article 134 (adultery) rather than under Article 120 (rape).

202.   Defendant Rumsfeld repeatedly ensured that the military, not the civilian authorities, investigated and prosecuted charges of rape and sexual assault.  Defendant Rumsfeld did so knowing that the military judicial system prosecutes only eight percent of those alleged to have engaged in rape or sexual assault, as compared to the civilian system, which prosecutes forty percent of those alleged to be such perpetrators.

203.   Defendant Rumsfeld permitted eighty percent of those military personnel convicted of sex crimes to be honorably discharged from the military and receive their full retirement benefits.

204.   Defendant Rumsfeld repeatedly permitted military Command to retaliate against those service members who reported being raped, assaulted and harassed. Reasonable discovery will show that Defendant Rumsfeld did not make any efforts to eliminate retaliation against servicemembers who reported being raped, assaulted and harassed.

205.   Defendant Rumsfeld authorized acceptance of recruits who have been arrested or convicted of domestic violence and sexual violence through a process of "moral waivers," because such recruits could not have enlisted under the minimum requirements without such a waiver.  The Lautenberg Amendment to the Gun Control Act makes it a felony for anyone convicted of a crime of domestic violence to ship, receive or possess firearms or ammunition. The Amendment does not provide any exception that permits the military or law enforcement to

ignore its prohibitions. Yet Defendant Rumsfeld knowingly granted "waivers" that permitted individuals convicted of domestic violence-related charges to join the services and carry weapons. See Department of Defense Task Force on Domestic Violence: Initial Report 53 (2001). Defendant Rumsfeld intentionally permitted such felons to serve in the military, which sent a clear message to his subordinates that preventing sexual violence was not a high priority.

206.   Reasonable discovery will show that Defendant Rumsfeld permitted military personnel on duty to ridicule both male and female subordinates by using sexually-charged and offensive terms such as slut, fucking whore, cunt, pussy, bitch, dyke, faggot and fairy.

207.   Defendant Rumsfeld's acts and failures to act during his tenure as Secretary of Defense led to a dramatic increase in the number of rapes and sexual assaults among active duty servicemembers.

208.   By the year of his resignation (2006), Defendant Rumsfeld's acts and failures to act had led to a **twenty-four percent** increase in the rate of rapes and sexual assaults when compared to the prior year (2005).

## DEFENDANT GATES VIOLATED PLAINTIFFS' CONSTITUTIONAL RIGHTS

209.   Defendant Gates violated Plaintiffs' constitutional rights by failing to take reasonable steps to prevent Plaintiffs from being repeatedly raped, sexually assaulted and sexually harassed by federal military personnel, and by impeding Plaintiffs' exercise of their First Amendment rights.

210.   Defendant Gates repeatedly permitted military Command to use nonjudicial punishment for rapes, sexual assaults, and sexual harassment, and to otherwise interfere in impartial investigations. Reasonable discovery will show that Defendant Gates did not make any

efforts to eliminate the use of nonjudicial punishment and Command interference into investigations.

211.    Defendant Gates repeatedly permitted military Command to retaliate against those servicemembers who reported being raped, assaulted and harassed.  Reasonable discovery will show that Defendant Gates did not take reasonable steps that should have been taken to eliminate retaliation against servicemembers who reported being raped, assaulted and harassed.

212.    Defendant Gates interfered with and opposed Congressional directives designed to eliminate rape and sexual assault in the military.  In July 2008, the Congressional House Oversight Committee on National Security and Foreign Affairs subpoenaed Dr. Kaye Whitley to testify on July 31, 2008, about her office's efforts to eradicate sexual assault.  Defendant Gates and his subordinates directed Dr. Whitley to ignore the subpoena, which she did.  As stated by the Chair of the Committee at the subsequent hearing, "But what kind of a message does her and the Department's unwillingness until now to allow testimony send to our men and women in uniform?  Do they take Dr. Whitley's office seriously?  Is she being muzzled, or is the Department hiding something?"    *See Hearing on Sexual Assault in the Military – Part II, Subcommittee on National Security and Foreign Affairs, Serial No. 110-188 (September 10, 2008).*

213.    Defendant Gates failed to ensure that the Department met its statutorily-mandated deadline of January 2010 for implementing the database prescribed by the National Defense Authorization Act for Fiscal Year 2009.  The Department was required to develop a database that would centralize all reports of rapes and sexual assaults.  To date, the database still does not exist.  There is no legal justification for Defendant Gates' failure to abide by the law.

39

214.    As reported on by the Washington Post on November 26, 2010, Defendant Gates and his subordinates ignored the competitive procurement process for contracting, and instead selected an inexperienced and tiny firm known as US2 to receive the $250 million contract designed to implement the Army's obligations to prevent sexual assault and harassment. Prior to being selected without any competition for the sexual assault work, US2 had only three employees and several small contracts for janitorial work.

215.    Defendant Gates' failures to act during his ongoing tenure as Secretary of Defense led to a steady and dramatic increase in the number of rapes and sexual assaults among active duty servicemembers. In 2008, the rate of rapes and sexual assaults within the active duty military increased by **nine** percent compared to the rate in 2007. In addition, the 2008 rate of rapes and sexual assaults against servicemen and servicewomen serving in combat areas (primarily Iraq and Afghanistan) rose by **twenty-five** percent compared to the rate in 2007. In 2009, the rate of rapes and sexual assaults within the active duty military increased by **eleven** percent compared to the rate in 2008, with a **sixteen** percent increase in the rates of rape and sexual assault among those deployed to combat areas.

216.    Defendant Gates is well aware that the military continues to retaliate against those who report rape, sexual assault and sexual harassment. The annual report published on August 24, 2010, admitted that military personnel refrain from reporting rape and sexual assault because doing so is perceived as having "lasting career and security clearance repercussions."

## COUNT ONE: SUBSTANTIVE DUE PROCESS

217.    The preceding paragraphs are hereby incorporated in full by reference.

218.    Plaintiffs possess a right to bodily integrity under the Fourteenth Amendment.

219.   Defendants condoned a culture which allowed sexual harassment, sexual assault and rape.

220.   Defendants' actions and failures to act violated Plaintiffs' substantive due process rights.

## COUNT TWO: PROCEDURAL DUE PROCESS

221.   The preceding paragraphs are hereby incorporated in full by reference.

222.   Defendants failed to implement military and federal regulations regarding sexual harassment, rape and sexual assault.

223.   Plaintiffs were denied justice, unfairly terminated and otherwise mistreated merely because they were victims of sexual assault, rape or sexual harassment.

224.   Plaintiffs were deprived of an individual liberty interest that is encompassed within the Fourteenth Amendment's protection of life, liberty and property.

225.   Defendants' failure to implement military and federal regulations regarding sexual harassment, rape and sexual assault violated Plaintiffs' procedural due process rights.

## COUNT THREE: EQUAL PROTECTION

226.   The preceding paragraphs are hereby incorporated in full by reference.

227.   Plaintiffs have a right to be free from rape, sexual assault and sexual harassment under the Fourteenth Amendment.

228.   Defendants subjected Plaintiffs to a pattern of sexual harassment, rape and sexual assault, failed to protect servicewomen and servicemen from rape, sexual assault, and sexual harassment; failed to conduct proper investigations and prosecute offenders; retaliated against servicemembers who reported being raped, harassed or sexually assaulted; discriminated on the basis of gender; and encouraged a culture of sexism and misogyny.

41

229. Defendants violated Plaintiffs' right to equal protection under the Fourteenth Amendment.

## COUNT FOUR: FREEDOM OF SPEECH

230. The preceding paragraphs are hereby incorporated in full by reference.

231. Plaintiffs possess a right under the First Amendment to report sexual assault, sexual harassment and rapes without suffering retaliation, including adverse employment actions

232. Defendants harmed Plaintiffs by retaliating against them when they exercised their First Amendment rights to speak about being raped, sexually assaulted or sexually harassed.

## JURY DEMAND

Plaintiffs request a Jury Trial.

## PRAYER FOR RELIEF

Defendants repeatedly and systemically violated Plaintiffs' Constitutional rights. Plaintiffs seek compensation for their injuries, attorney's fees and costs, and such other relief as the Court and Jury deem just and proper.

Susan L. Burke (VA Bar No. 27769)
Counsel for Plaintiffs
BURKE PLLC
1000 Potomac Street, N.W.
Washington, DC 20007-1105
Telephone: (202) 386-9622
Facsimile: (202) 232-5513
sburke@burkepllc.com

Date: February 15, 2011